This is an order of magnitudemontage quid pro quo. Quid pro quo. Oh. Say again. Quid pro quo. Quid pro quo. The court will proceed to the second case of the day, Anderson v. The City of Rockford. Mrs. Keene. Good morning, Your Honors. May it please the court. My name is Roshna Bala-Keene, and I represent the three plaintiffs in this case, who were each wrongfully convicted and spent more than 12 years in prison for a crime they did not commit. As I will go through today, the evidence in the record, coupled with the admissions by the lead detective in the case, create factual disputes that should not have been resolved at summary judgment. There are triable claims here, and they should go to the jury. The evidence I'll start with of police misconduct is extraordinary in this case. The lead detective testified under oath that he knew, quote, the three men did not do this crime, period, end quote. And he testified that he instructed witnesses to, quote, testify consistently with their statements, even though he believes their statements were false, were not truthful. Then in civil discovery, when asked about the specifics of his misconduct, he refused to answer and invoked his Fifth Amendment privilege against self-incrimination as to every question about whether he fabricated the two key witness statements, whether he hit the witnesses, whether he coerced them, whether he buried exculpatory evidence that would have impeached the two material witnesses. He asserted the Fifth Amendment in every regard. And at summary judgment, the permissive adverse inference that can flow from that Fifth Amendment invocation, especially here where it's amply corroborated, cannot be drawn against the plaintiffs. But that's what the district court did in this case. The jury has to decide whether to draw the adverse inference. And we are familiar with the summary judgment standard, which holds that reasonable inferences have to be drawn in favor of the non-moving party. That is true with all testimony, including invocations of the Fifth Amendment. I'd like to start by highlighting five or six facts in the record that when laid out in sequence really highlight the extent to which the police had to fabricate evidence of the plaintiff's guilt. Before you get into the facts, can I ask you, what's the correct legal standard for stating a 1983 claim for a Brady violation? The reason, and I'll tell you why I'm asking the question, our case law seems a bit muddy on this. We have a recent case that suggests that the Brady violation can be inadvertent. That's this Gowdy case from May of this year. But then we have cases from the past that say it must be reckless or willful. What's your view on what the correct legal standard is to state a 1983 Brady claim? We know there has to be personal involvement, and that's not an issue here. You know, the pattern jury instructions were recently revised and don't speak specifically to the element of whether, I think the court's asking about bad faith. I think I'm going to answer that question by saying, in this case, we are attempting to show that the defendants understood the materiality of the evidence and suppressed it in bad faith. I mean, I don't think you have to show, I guess I'm answering that question by saying, in this case, the facts take it so beyond the pale that we don't need to, I don't think it's an open question. So in other words, for each of the Brady claims that were advanced that you want to have a trial on, you believe that there was error in granting summary judgment on, your point is that even if you go under the higher standard, like reckless or willful, you still get the trial. That's correct. Nothing hinges upon whether anything was inadvertent, and in your view, nothing was inadvertent. And they don't argue that, Your Honor. I mean, they don't- No, no, no, I know. But when we write an opinion, we got to articulate what the legal standard is. Yeah, and I don't think we're blazing new trails with the facts here. I mean, I think the facts on the Brady claim simply put are, the defendants coerced the two witnesses, Alex Douthert and Latorian Brown, and we didn't know about that coercion until after the convictions. For example, we didn't know that Latorian Brown was threatened to be put in jail unless he gave a statement, and held against his will for more than nine hours, until he so testified, Latorian Brown testified to that at the 2015 retrial. That impeachment evidence was material because when the trier, in fact, heard that evidence in the retrial, and the trier, in fact, was the chief judge of the Winnebago County Circuit Court, the court acquitted the plaintiffs. I mean, Latorian Brown's statement, once you know all of the ways in which it is heavily impeached, simply does not hold up. That is true with Alex Douthert as well. Alex Douthert is on the fifth in this case, and the adverse inferences can be drawn against him that if he testified truthfully, he would be exposing himself to perjury. Doug Palmer, the detective in the case, the lead detective in the case testified, took the fifth, but also testified that he instructed Douthert to testify falsely, knowing that the statement was false. There is deliberate suppression of exculpatory evidence here, both with respect to the witness coercion, and with respect to other evidence that showed that the statements were false. Rekita Young is the best example of that. Immediately after the shooting, Alex Douthert and Latorian Brown fled the scene. They drove to Rekita Young's house at Concord Commons. Rekita Young was their cousin and close confidant. And they said, we've just been shot at, we don't know who did it. Now, that statement was made available to the police very early on in the investigation, because they interviewed Rekita Young, and she told them, her testimony is in the record, she told them that Alex Douthert and Latorian Brown did not see the shooter. And this is a statement they made to her before there was police involvement, immediately after the incident, and with no motive to lie. What did they do with Rekita Young's statement? They did not include it in the police report. And they waited until they got Latorian Brown's statement secured to prepare the Rekita Young police report, and they excluded that. And the defendants do not dispute that the Rekita Young statement was suppressed and withheld. They attempt to avoid a Brady claim here by saying, well, it didn't matter that they suppressed Rekita Young's statement, because it was cumulative of other evidence in the case. But it's not cumulative. The thing they say it's cumulative of is that the witnesses themselves told the police they didn't know the shooter. So why does it matter if Rekita Young also told them that? Well, at the jury trials, the police and the witnesses waved away that earlier denial of knowledge to the police by saying they said the witnesses didn't want the police to be involved. That's why they told the police that they didn't know anything. But had the jury known that those two witnesses told Rekita Young the exact same thing moments after the shooting with no reason to lie, and there is nothing in the record that suggests that they had any motive to lie to Rekita Young, it eviscerates that explanation for why they told the police they didn't know the shooting. And so it's not cumulative, and it's extremely impeaching of both witnesses' later statements and trial testimony. The defendants knew the two statements that they were fabricating were false in other ways. There's evidence about the red car. It's undisputed that a red car was involved in the shooting, a red Grand Prix. It's undisputed that the detectives in the case figured out who had that red car, and it was a guy named Casale Montgomery. Casale Montgomery told the police multiple times, quite frankly, even though it was disadvantageous to him to do so, that he never loaned that red car to anybody. So how do you put the plaintiffs in a red car at the scene of the shooting? It's false. The plaintiffs didn't have a red car. Everybody knew that.  and they didn't have a way to get the red car into plaintiffs' hands. So after they got the signed statements from Latorian Brown and Alex Douthard, they went to Casale Montgomery, and they forced him to say that he loaned the plaintiffs his red car. This is investigative techniques that are beyond the pale, Your Honor. This is not a close call of Brady violations or misconduct on the margins. We have testimony from Casale Montgomery that says, Palmer told me to lie. He told me to say Anthony Ross borrowed my car. Now the jury may choose not to believe Casale Montgomery, but certainly the district court couldn't have made that decision. The district court had to send these facts to a jury. We also know that they- Can I focus on the statement of Bryce Croft? Yes, Your Honor. You know what I'm talking about with Bryce, you know the Bryce Croft statement? Yes. And the affidavit, his initial statement and the affidavit and all that. Here's what I want you, I could use some help with. Why should we think about that statement as a statement that goes to your fabrication claim as opposed to your Brady claim? Because I thought that the substance of what Bryce Croft would have delivered, had you known what happened, had you known, or at least as you allege, that the Bryce Croft affidavit was fabricated, that Bryce Croft would have been called as a witness to exculpate the defendants at the criminal trial. In other words, it's not that anything about Bryce Croft was used to convict these three men at all, right? Even though the affidavit was fabricated, it seems that the upshot with Bryce Croft is all about exculpation. So why doesn't that more neatly fit or more cleanly fit into a Brady analysis as opposed to a fabrication analysis? It does fit neatly. I accept the premise there, which is that it is probative of the Brady claim where it shows that exculpatory evidence was withheld. Because it even goes to the Kyle line of cases, where you know- Had they known it, that's the way they would have used it at trial. Right, I mean, I think in our briefs, we really argue that that evidence and the Cassell Montgomery evidence was relevant both to prove the fabrication claim and the Brady claim, and I apologize if it was more forcefully or less articulated in the Brady context, but I agree with the premise that their conduct towards Bryce Croft and Cassell Montgomery goes to the Brady claim as well. I wanna just speak briefly on the fabrication point. We argued in the briefs, and I think we stand by the position that the fabricated evidence of Bryce Croft and Cassell Montgomery fit within the confines of the Whitlock, deprived of liberty in any way, but the court doesn't have to consider whether those are stand-alone fabrication claims. Because as the court is, I think, pointing out, the evidence of what they did with Bryce Croft and Cassell Montgomery is just evidence of the way that they handled witnesses in the case, and it's probative of the fact that they conducted a biased investigation where they were trying to mold the evidence to fit their theory, and they needed to, basically, both Bryce Croft and Cassell Montgomery are their effort to get the plaintiffs into the red car, or at least take the true owners of the red car out of the picture. And so they're really just tainting the evidence that's in the record so that the plaintiffs can't use it at trial, can't use truthful evidence at trial to show that they never had the red car. So going back to the knowledge of falsity and to the Brady claims, I mean, in essence, we have Brady and fabrication claims, and both are really saying that the plaintiffs were denied a fair trial, and they absolutely were. And there are different avenues to get to the violation of the fair trial. There is the fabrication of the two statements here, Douthert and Brown. There is the other evidence that they fabricated to then fit those two false statements, and that's Bryce Croft, Cassell Montgomery. And then there's the Brady claims. There's the tapes. There's the Rakiti Young statement. There's the fact that they withheld the witnesses' coercion and the great lengths to which they went to get these statements from them. And that was all withheld. And I just wanna make a point about that Brady claim. I mean, it is undisputed. It's very well settled in the circuit's case law in Avery and Fields too, and Newsom, that coercion of a witness is the kind of evidence that has to be disclosed, especially a material witness. That's not a claim on the margins by any stretch. You have to disclose the corrupt origins of the witness statement. Latorian Brown was threatened to be put in jail unless he gave a statement. And the plaintiffs did not know that when they were trying to impeach him at their criminal trials. Alex Douthert was hipped. He was subjected to new charges of forgery, parole violations. He was relentlessly pursued by the police, threatened. He was fed facts, and he even says on the tapes, I don't know why they're doing this. They know I didn't see what happened. And the answer is clear. They need some evidence to be able to go after the plaintiffs. They don't have any evidence because all of the evidence is really not leading to the plaintiffs. It's leading to the person who had the red, excuse me, the red car, Casson Montgomery. And so the fact that they fabricated both of these witness statements is so important because there was no other evidence of guilt. There was no physical evidence. There was nothing to support these convictions. And we know what happened in the criminal retrial. You know, Alex Douthert didn't stand by his previous identification of the plaintiffs. He took the fifth. And Latorian Brown gave very, very choppy and uncredible testimony and said, I didn't see anybody get out of the red car. And he was heavily impeached by the fact that he was coerced and threatened. And at the end of the day, the judge reached, you know, looked at that evidence and concluded that the plaintiffs should be acquitted of this crime. I'm into my rebuttal time. Can I ask you a question that I'll apologize in advance for? It's nitpicky, but I just want to be sure that it's right, okay? Because of the work we're going to have to do after the argument. In your reply brief, you say in pointing to the record, there's been some confusion. This is on page six. You got your brief there? I do. On page six, and you, you know, apologize for the way different things in the record have been cited. And you say the correct prefix is record 249. Isn't it 229? We can't find anything at 249. Everything is 229. It's, it is 249 where all of the exhibits to plaintiff's statement of additional material fact in the record. Yeah, I don't want to hold, I don't want to take your time. You got rebuttal time, but maybe- If you would permit me to go back and maybe submit, I could submit as an additional appendix the exact documents with the docket number. I will do that. Thank you very much for your time. Thank you, Mr. King. Mr. Smith. May it please the court, I'm Andrew Smith and I represent all of the individual defendants in this matter except for defendant Palmer. Plaintiff's argument is in large part based on misstatements of the record that just don't fit. By way of example, in their initial brief, as they did in their brief before the district court for summary judgment, they say that defendant Esparro directed Palmer to make a liar out of Bryce Croft. In sight to a few pages of Palmer's incredible, which is what it was found, testimony at the post-conviction hearing. Nowhere in those pages, nor anywhere else, does Mr. Palmer say it was Esparro. He does mention in that context, Greg Lindmark, who is deceased and no longer a party to this matter. Like so many of the defendants, and so often as plaintiff's counsel, whether in brief or in argument, says they, all inclusive defendants, did these wrong things, they don't identify which ones they're talking about. But by way of example, with Esparro, in that misstatement of record in their brief, this was pointed out not only in our reply brief at the summary judgment level, but also by Judge Coppola in his decision that that's just not accurate as is much of their statement of the record. They can say it over and over, but it doesn't change what the actual record says. They mentioned- So Mr. Smith, I really appreciate the way you're approaching this here. Yes. Here's the way I've sorted through it with respect to your clients, and you can tell me whether I'm right or wrong. Right. Okay. You can argue against the merits of it, so set the merits aside for a second, okay? But Mr. Stevens may be in play, according to the plaintiffs, because of the Brady issue with the tapes. Understood. Okay, I know you may disagree with that, but at least he's in play. Right. Okay, Mr. Mastriani may be in play because wasn't he present at the interview of, I don't know her first name, Ms. Young, R. Young? Right. Okay. But I don't think any of your other clients are in play on the facts. And, you know, Isfara, Randall, Glover, et cetera. You agree or disagree with that? Absolutely, and thank you, Your Honor. Absolutely. I don't even know how else to respond to that. I absolutely agree. And so then I'll address- Well, you don't, I mean- No, I absolutely agree, I'm not finding it easy. No, and I'm glad Your Honor recognized that as well. So I'll address those two things. First and foremost with Stevens and the tapes. It's impossible that there was a Brady violation when it was a subpoena from the Assistant State's Attorney, Mark Carner, it's of record, to the State's Attorney's Office for those tapes to be turned over. They were, in fact, turned over prior to the first trial. Granted, it was a short period of time which was pointed out by the trial court. Keep in mind as well that it's totally impossible that it could have been a Brady violation which, with regards to now plaintiff, then defendant, Ross, because he wasn't tried, he had his case severed, and wasn't tried for about a year and a half later in February of 04, the first trial being in October of 02. So that's that, okay? So the only argument they possibly could make is it wasn't enough time, but it was, in fact, turned over. But then we get into whether or not it's admissible, and we spend a great deal of our time in those briefs, and I'll come back to that momentarily. Can I comment on that? Here's what I think is very difficult, okay? You've got two Illinois courts that have found that these tapes are both material and were produced too late, okay? Now those conclusions I know you disagree with, okay? But they are far from arbitrary, or invented, or anything like that. They do have some footing in the record that is before us. So the question I have is why doesn't that create a genuine issue of material fact for a trial? You may win, okay, you may not, but why isn't it, in light of what the Illinois courts said, enough for a trial? Because then it also goes to, first and foremost, is whether or not they'd ever be admissible as well. It's not just the materiality of it, but also whether or not those same tapes would be admissible subsequently at a trial, number one. And number two, when it comes down to it, is whether or not they would be admissible to the extent of even being used that would affect the outcome of any criminal trials. In other words, there is no way to get past the clear hearsay that those tapes provide. Secondly, even if they were, and the tape they continue to refer to, it says in there that, they've repeatedly said that, is that, well, Douthert says he wasn't there. That's what he's telling Lambert in this infamous conversation with him. He also, in that same transcript, within a couple of pages in the exact same conversation, says, once he realizes, Lambert lets him know that Brown had told the police they were there, says, yes, I was there, I wanna talk to Theo, which is actually Glover. He requested the detective that went down. So set aside the authentication question altogether for a second, right? The city's better off speaking to that, okay? But why in the original trial, if we suppose that defense counsel had the tapes in enough time, they listened to them, et cetera, et cetera, why would they have to offer the tapes for their truth? Why wouldn't they just offer them to impeach the testimony of Alex Douthert? Because it would've- You see, they're being offered to show a prior inconsistent statement. They're not being offered for their truth. I don't disagree. However, it would be cumulative at that point because he also gave inconsistent statements, the exact same thing as he kept telling the police over and over, leading up to all of these tapes, all of those conversations are before the written statement. Their attack on this is somehow about the written statement. All of those are exactly what he'd been telling the police for six weeks in between the murder of his nephew and the written statement. Okay, on this point, here's what troubles me. It's unfortunately not uncommon that people lie to the police upon initial arrest. See it all the time. It's altogether different to be telling your mother, or your sister, I'm sorry, your mom and friends, I didn't see what happened. So from a criminal defendant's perspective, the reason the tapes are important is because they can poke a hole in this line that of course he lied to the police. They all lie to the police. But you think he's lying to his sister? You think he's lying to his mother? In other words, it gives the context of the statement adds to the weight of its veracity from the criminal defendant's perspective. Judge, if I may, I'd like to correct your honor because there's a misunderstanding of what the actual evidence is. The conversation with his sister is also with a third young lady, and it's one of the two women who say that. The transcript shows it's not Mr. Dauther who said he wasn't there, it's one of them. And turning around as well to the Raquette Young issue, she testified in the post-conviction hearing that Alex Dauther told her, they didn't tell him who was shooting at them, but she did tell them, and that's in the report, that Ace, Tywan Anderson, was he and Dauther got into earlier. Secondly, and most importantly, she also says in her testimony on behalf of the plaintiffs in the post-conviction hearing that Dauther said they were being shot out at his mother's house, which is Estelle Dauther's house where Demarcus Henderson was murdered by these three plaintiffs the night of April 14, 2002. So those are some of the record that's very specific, that's portrayed to the court as this big ado about nothing is really what it amounts to, because the actual evidence of record doesn't support, it wouldn't have changed the outcome. This is all about Dauther and Brown. Judge McGraw, Chief Judge of 15th Circuit, did not reverse this. Anything to do with Brown who said, yeah, Palmer threatened me to go to jail if I didn't tell the truth, but yes, my statement was true from the get-go, my testimony was true. Dauther never changed his story, Brown never changed his story, and said it's these guys. Thank you. Thank you, Mr. Smith. Mr. Hulotari. My name is Joel Hulotari, I represent defendant Doug Palmer. With respect to the last issue that was raised, I'll point out that during these jailhouse conversations, we have conversations between two felon gang members during recording by the IDOC. So they're not just talking to their sister or their mother, they're talking to the warden, they're talking to the parole board, they're talking to the police. They know what to say and not implicate themselves. So of course they're gonna say, I wasn't there, I don't know anything about it. They don't want their parole to be violated. They know they're being taped on a jailhouse phone. Of course they're going to lie. Those are not reliable conversations. That's another reason why they're not admissible. There's a host of reasons why they're not admissible though. Number one, the tapes were never even a part of the summary judgment record, a transcript was. The transcript is full of holes. It's got large gaps that were inaudible, it's got all kinds of reliability problems. So there's a- The tapes were produced by who? I believe they were produced by plaintiff's counsel who had them typed up. But if you look at the verification on the transcripts, the court reporter or the transcriptionist doesn't verify their completeness or their authenticity. It just says on this date, I transcribed these tapes. So we don't have a version of the tapes in a form or format that's admissible or reliable. And for that reason alone, I think the tapes are a big red herring. And incidentally, it's worth noting the tapes were never introduced in any of the underlying cases. When people had the tapes, they were never used. So how important are the tapes really? I think the tapes are just useful in this context in hopes of ginning up a reason to win a money judgment against these defendants. So that's with respect to this latest question of yours, Judge. And incidentally, before we get too far off the subject of the tapes, not only is it hearsay, not only is it cumulative, not only was it never made a part of the record or authenticated, but they're not the best evidence under Federal Evidence 1002, and they lack the circumstantial guarantees of trustworthiness that would allow them to be admitted. So- At the original, if we rewind hypothetically, I know it didn't happen. And the tapes themselves were used in an effort to show that Alex Douthert made a prior inconsistent statement vis-a-vis his trial testimony. It wouldn't have been being offered for the truth. It would have been being offered for a cumulative and redundant purpose, and that is to show that he's at times that he didn't know who was shooting at him. But he already told the police that on multiple occasions. And it fits, as I mentioned in the briefs, it fits perfectly well with his additional statement that he didn't tell the police what he saw that night because he wanted to handle it himself. And if his plan was to get revenge against the kids who killed his nephew, he's gonna play dumb and act like he doesn't know anything about it so that when these people show up dead, he has an alibi. He says, oh gee, I didn't know who killed DeMarcus. I was oblivious, it wasn't me. I didn't know anything about it. So of course he's gonna play dumb. And he did play dumb to the police for the first few times they interviewed him. And then while he's being eavesdropped on by the police in the IDOC, he continued to play dumb. So it's just a part and parcel of his pattern of acting innocent and oblivious until, as my co-counsel mentioned, he finds out that his colleague who was there that night has already confessed and spilled the beans that they were there, they saw the shooters. Then he says, yeah, we've got a problem. I wanna talk to Theo. We were there. So that's also on the tapes. So is it relevant or irrelevant what the two Illinois courts have found with respect to these tapes? Well, I think it's irrelevant. I think that this court has to decide what's admissible under the federal rules of evidence. I don't think that the Illinois court's decisions on that point are controlling. So with that sense, I think the tapes are a big red herring. Opposing counsel referred to Detective Palmer as the lead detective multiple times. The transcripts from the evidentiary hearing where he testified show that he said he was the co-lead detective with Stevens. Just point that out to clean up the record on that. With respect to Palmer, there's a lot of talk about what he knew. He knew what happened that night, yet he allowed these statements to come out anyway. Well, he wasn't there. Nobody, including opposing counsel, is gonna tell you Detective Palmer was a witness to this murder. He doesn't know what happened. All he knows is what people told him, and that includes statements from witnesses that he took. Now, taking a statement from somebody and having a sort of a gut disbelief or distrust of what they're telling you, that does not mean you're fabricating a witness statement just because you have your subjective doubts. If Palmer had doubts, that's not Brady evidence that needs to be disclosed. And if you look closely, this is especially important for purposes of inferences under the Fifth Amendment. Read very carefully the record with respect to what Palmer says. Palmer doesn't say, I knew X happened, but I made up this evidence that said Y. He just says, I think they're innocent. The first time I interviewed Mr. Johnson, I made up my gut opinion that he was innocent, not based on evidence that was withheld or fabricated. It was just his gut as a detective. What was his testimony or what's the upshot of his testimony with respect to Bryce Croft and the Bryce Croft affidavit in particular? So I'm glad you brought that up, Judge, because again, I think much of what we're talking about today when you drill down and you really focus on the record and not the spin. I thought he admitted, excuse me, that the statements or some of the statements in the Bryce Croft affidavit were false. That's right. Yeah, Palmer admitted that parts of the Bryce Croft statements included content that he provided to Bryce Croft, that Bryce Croft adopted by signing that statement. But if you go back and you look at the evidentiary hearing and you read Croft's own testimony on what really happened, he totally backed away from his first statement, basically admitting that his first statement was a lie. Croft, at the evidentiary hearing, said, "'Cofensi' never talked to me about the shooting," contrary to Croft's first statement. He said he never saw Cofensi with a gun that night and that he was not sure whether he might have made up the entire story. Croft made up the entire story. That's what Croft said, and that's at the record on page 21. If that is what he was gonna say when he took the stand, then it doesn't matter if his second statement included some additional details that he did not first provide to Palmer because he was a liar to begin with. His first statement was no good. It was not reliable, and on the stand, he would have testified as he did at the evidentiary hearing and said, "'Yeah, I might have made it all up.'" So there's no prejudice, and if there's no prejudice, you've got no breeding issues, you've got no fabrication issues. But he never testified at the trials, right? He did not testify at either trial. He testified at the post-conviction evidentiary hearing where he basically walked away from his first statement, which supports the point that his second statement doesn't really matter because he was an incredible witness who would have provided useless testimony anyway if he had been called to trial. So it's a big so what. With respect to your other question about what is the standard in light of that new case, Gowdy, I would submit that the standard is reckless or willful, and that's supported by Carrell v. Alderden, 821 F. 832. I realize that that most recent opinion casts some doubt as to that issue, whether it might change the standard, but in this case, the plaintiffs have only ever alleged willful withholding of Brady evidence. They've never said it was inadvertent or innocent. So I don't think that is really too important for us to spend too much time on. You know, you're over your time. But no, no, you may have a minute to wrap up. I don't want to cut you off. In conclusion, I would just summarize by stating when you drill down to the records and closely read the actual records, not the spin, you'll see that the position we've taken in support of affirming the district judge is well taken. Thank you. Thank you. Mr. McBama. Good morning, your honors. May it please the court. I am Ife Morbon and I represent the city of Brockford. We ask that you affirm the lower court summary judgment order, again, in favor of the city of Brockford, not just because summary judgment was proper in favor of the individual defendants, but also for independent reasons. Plaintiffs, in their Monell claim, they should advance evidence showing some express policy or some practice or some custom that caused their injury. They have not done that. And in fact, they barely mentioned that since after the summary judgment was entered. They have to show that their constitutional rights were violated as a result of this widespread policy or practice, which the city was aware but did not correct. They didn't do that because they failed to demonstrate the existence of some formalized policy or some practice, maybe pointing to prior incidents which should have put the city on notice as to this particular conduct that eventually resulted to this constitutional injury, which was some kind of policy which was ratified by city policy makers. The district judge, the district court properly entered summary judgment in favor of the city so that in the event that even if the court disagrees and says there are some grounds on which summary judgment in favor of the individual defendants should be reversed, summary judgment in favor of the city should be affirmed. Do you read, are you that sure about the district court opinion? Because the way I read it on the city is without there being any individual violation, the district court just didn't even reach the claims against the city. It didn't, in other words, it didn't do the Monel analysis that you're talking about. That is correct, Judge, but because the court has jurisdiction to either affirm or reverse on any ground in the record, our position is that the record is to fit with evidence in which this court could find that summary judgment is proper in favor of the city. And if there are no other questions. I got one question. Is the city taking the position that the Dauther tapes aren't authentic? There are some questions about the tapes. I think the simple answer would be we're not sure. In the record, if I could point specifically to the testimony of Detective Stevens who received the tapes and who saw the tapes afterwards, there were some comments that he made based on his recollection that the tapes which he sent to the IDOC to make the recordings were not the tapes that he saw several years after. So that kind of casts some doubts on the authenticity of the tapes. But if you go to what the recordings are, there are many questions there as to what was actually being said. Plaintiffs themselves do not rely on the audio themselves. They rely on the transcripts, which also, I think, adds even more problems to the issue of the authentication of what was said. There are no other questions we ask that we have from the District Court. Thank you, Judge. Ms. King. Thank you, Your Honors. I'll start with the tapes briefly just because that was the most recent topic. To be clear, both sides had the audio recordings of the tapes. The plaintiff's attorneys had them transcribed by a regular certified court reporter. They were verified, and those transcripts had been attached. They could have submitted competing transcripts or argued to the jury that the transcripts, that there are words inaudible and things like that. But all of the arguments that they made about the tapes are arguments that really are for the jury. The tape shouldn't be believed because Douthard was lying or he had a motive to lie. Those are not assumptions that can be made at summary judgment. I mean, they are essentially advocating that all of our claims should be dismissed at summary judgment because there's no evidence to send to the jury. And that is the spin. The tapes contain- Was there any challenge to any of the tapes? I mean, with regard to- I apologize, I didn't hear you. Were there any challenges to the tapes as you described? No, no. And they had the audio recordings. And I don't understand the criticism that was made in the briefs in an argument that they're not part of the record. They're part of the record. The court, there's a footnote in the summary judgment briefs that they had the audio available to the court should the court wish to listen to the actual audio. There's no suggestion that transcripts, which are routinely used in lieu of attaching actual audio files, would be unreliable in this case. And they were signed and using the standard language of that court reporting company by both the owner of the court reporting company and the court reporter herself. And I agree with the court that we don't have a response to the fact that the tapes are admissible as impeachment. I mean, they impeached Douthard. And also, they come in at the civil level at our Brady claim because that's the impeachment evidence we say was withheld. They can challenge the materiality of the tapes, but that is a jury question. Whether those tapes are material and would have made a difference to, and the lower materiality standard in the Brady context is whether those tapes would have undermined confidence in the verdict. And they certainly do. Your Honor asked a question about the defendants in the case. I just want to briefly address that. The defendants, Defendant Stevens, we allege that he was part of the coercion and fabrication of Douthard's statement. He was there for the original interrogation and for the Big Muddy interrogation on May 2nd. Stevens is specifically mentioned in the tapes as feeding information to Douthard, and Stevens admits that he used Lambert as the go-between. Palmer is a defendant. He and Stevens are co-leads. Their fingerprints are all over this investigation. Randall is participating in the Douthard interrogations, and he's present for the coercion. We have testimony as well that Randall was involved in the Cassel-Montgomery fabrication. Mastriani, we agree, has a more discreet role, and he goes to the Rekita Young statement, but there is a conspiracy claim that we believe goes to all of the defendants. Detective Stevens told the prosecution there was nothing relevant in the tapes. That was untrue, and a jury can evaluate that. In conclusion, Your Honors, we think a great injustice was done here. These claims should go to a trial, and we ask that the court reverse on all of the claims that we've raised in this appeal. Unless there are no other questions, I will stand. Thank you, Ms. Keefe. Thank you, Your Honors. Thanks to all counsel. The case is taken under advisory.